He's number 13, 31, and 14. Michael Goudenberg v. Robert Welch. Worldwide University, 1565. He was a fellow and coordinator of the Tellers Foundation. Ms. Cunliffe. Good morning, Your Honor. Your Honor, my name is Erica Cunliffe. I'm here on behalf of Petitioner Michael Goza. I would like to reserve five minutes for rebuttal. Mr. Goza, may it please the Court. Counsel. Mr. Goza is asking this Court to grant his request for a writ of habeas corpus so that he can obtain a trial represented by competent counsel. In a case where the government's evidence rose and fell on the identification testimony of a single child who testified that she never saw his face, her attacker's face, Michael Goza was convicted based on a face-shot photo array and her subsequent in-court identification. And fingerprint. There was a single thumbprint, Your Honor. That's correct. But when the jury determined whether or not her identification was correct, they did not know that, in evaluating it, they did not know that the child's first identification was of another man. And that should undermine this Court's confidence in the outcome of this case. The question before this Court is, in failing to get this evidence,  was counsel's performance so poor that it prejudiced his client? We're just talking about the one instance or both times that she identified somebody. She identified her father, sort of, didn't she? The youngest. Maybe just briefly setting out the facts a little bit here would be helpful. There's a younger child, a 3-year-old. I identify her as KJ. She initially identified her father as the attacker. The older sister, the 9-year-old, identified... Another man. I'm sorry? She identified another man. She did. Initially, right after the incident, she identified... She identified another man. Yes. The older sister testifies at trial. She's a 16-year-old. She was not home the night of the intrusion that involved the two younger sisters. The older sister testified that 16 days, 2 weeks before this incident, she awoke to find Michael Goza in her bed, essentially. They talked, and she walked him out. And that's essentially the testimony here. That's the identification. With respect to the fingerprint, Judge Gilman, the fingerprint could have been left at the time that Michael Goza was in the house, visiting the older sister. In fact, there's no evidence that the fingerprint was left at any particular time. The fingerprint expert could not provide any timing regarding the fingerprint. Sort of the MO, though, involving your client with TA, the 16-year-old, was similar to what happened with the victim, in this case, CA, right? I dispute that. And I say this because the grand jury didn't indict Michael Goza with any sexual misconduct involving the older sister. The grand jury only charged him in connection with any incident that night with burglary. Of course, we don't know what the grand jury heard. They probably didn't hear any evidence about that, right? Your Honor, I believe— What the grand jury doesn't do is not really relevant, is it? Well, if the argument is going to be, he molested one, so therefore he molested the other, then, of course, I believe it definitely is relevant. And I say that because the testimony— The grand jury indicted him, is what I'm saying. Whether the grand jury doesn't indict somebody is not relevant to anything. Well, he wasn't charged. He wasn't accused of sexual misconduct involving the older sister. I, you know, whatever the grand jury's function is— No, I mean, whether the significance is the method of operating in terms of his approach, his entry to the house, his activities, when he got there, I mean, there are many reasons why that might or might not be charged. And there are a couple of ways in which it might be significant in his ultimate trial involving the assault of the middle daughter for lack of a— Okay. That's probably—I mean, I don't dispute what you're saying, but I think that when the jury is weighing all this, the testimony the TA provided was that she woke to find him in her bed. He was basically touching her over her clothes. And she said, this is not going to happen, and she walked him out. And that's it. That's the testimony. Whereas both of the other girls claim a considerable assault. One testified that she woke to find him, her pants off, and she kicked him off the bed, and he ran off. And then there was testimony from the other child that another individual, or certainly not my client, she didn't identify my client, that he had touched her vagina in some way. It's not exactly clear. The other man that she first misidentified, Givens, was his name. It's kind of confusing, Goza and Givens. Goza, Givens, Jarvis, yes. But Givens, it was later pretty well conclusively shown that he had a full alibi, and it wasn't him, right? The police ruled him out. But in order to rule him out, they had to ascertain when this incident happened. And it's unclear exactly when this incident happened. The argument is that Givens had purchased drugs somewhere else. He was pill shopping. He had purchased drugs in Maple Heights. And the supposition was that he couldn't have made it to Fairview Park within a certain amount of time in the middle of the night. And it's not exactly clear when the incident happened. Well, I'm not saying here that Givens necessarily should remain a suspect. I'm not saying that I concede that the identification of Givens was a mistake. Givens may well have done it. This is a habeas case. Are we under AEDPA? No. Frankly, under AEDPA, I should win anyhow. But this is a de novo case. And it's a de novo case because although this issue was raised in the petition for post-conviction relief, despite what the warden has indicated, and I just refer you to paragraphs 49 through 52 of my petition. It's in part one of the ineffective assistance of counsel claim. The trial court or the post-conviction court, she concluded that the issues were raised judicata. That's not true. In the court of appeals, they simply missed the issue. They didn't rule on it. So no court has looked at this issue. So I'm here asking you to look at it. So we don't have to give any particular deference as we would under AEDPA then? No, you don't. No, you don't. This is just an ineffective assistance of counsel claim. I just want to address briefly the warden's characterizations of some of this evidence. First of all, it characterized this case as overwhelming. If this case is overwhelming, it's overwhelming for one aspect, and that is that Mr. Goza was in the house on March 10th. To the extent that the evidence is overwhelming, you've got the fingerprint, you've got T.A.'s testimony, then that's the overwhelming evidence. But regarding the March 26th incident, there is simply no identification of him. Other than C.A.'s identification. She identifies him from the photo array and at trial. Two and a half weeks later. Correct. And she's confident, and she's a compelling witness, and the prosecutor who tried this case took pains to demonstrate that she was smart, articulate, bright, honest, heroic. She kicked this person off the bed. And that she was reliable as a witness. The fact of the matter is that extra evidence that wasn't presented, that Mr. Givens, she had identified Mr. Givens immediately afterwards, that's evidence the jury should have accounted for. Because other than C.A.'s identification, there is a link, but it's a difficult case to connect him on March 26th. Well, let me ask you this. The fingerprint was found on the back window, is that right? There are two windows, and I'm understanding that it's on the outside of the window by T.A.'s bed, behind T.A.'s bed. So you think, is that the side window? I believe it's the side window, yes. Do you believe it's the same window by which he entered on March 10th, or the same, it appears that he entered on two different, or at least it's inconclusive. Because on the second time, you can't tell. That's correct. And again, because we don't have the timing of the fingerprint, heck, Mr. Goza, if he'd been there once, and there's some indication based on T.A.'s testimony that he'd been there more than once, because he had an interest in her, they had gone out on one occasion, he had sold her drugs, he sold drugs to her neighbor, he could have been there at any time. He could have been there more than once. He could have looked in, tried one window, and given up and tried the other. It's simply not clear because they can't date the fingerprint. I'm going to reserve the balance of my time for rebuttal, unless there are any other questions, that's what I'm going to do. Thank you. Mr. Chris. Good morning, Your Honors. My name is Scott Chris. I'm here on behalf of the Attorney General of Ohio, representing the warden. I think the evidence was overwhelming, although admittedly much of it was circumstantial. But as I think some of your questions indicated, the testimony of T.A. was very relevant to sort of his motive, his M.O., how he likes to do business, sneaking in through windows. He'd done it before in that very house. He knew how to gain entry into that house. And because he lived so close to the Jarvis' and had a relationship, however tangential, with the older daughter, he likely knew that there were younger girls in the house. So he certainly had the opportunity and he had the wherewithal to do that. The fingerprint evidence was significant because of the position of the bed in the room. The older daughter testified that when he gained entry, he must have used the side window because her bedroom was under or her bed was under the other window. So he would have had to climb in on her head if he had done so when he came in for her. So the fact that the fingerprint was found on that window was significant evidence that he had used that window on the night that he molested the younger two girls. That was the side window? That was the back window that had the fingerprint that the bed was under. And I believe that it was the father who testified that he thought that the bed was damp. He felt the bed and felt that it was damp that night when he went to investigate all the windows and doors in the house to see what was open and unlocked. He found that those windows were unlocked and that, in his opinion, the bed was damp. Is the inference that it was damp from someone climbing in from the outside that evening? Yes. Not because the daughter, the 16-year-old, had been there because she wasn't there that night? No. She was not living in the house at the time. Just to make sure I understand about the window, the prosecution's position was that there was an inference to be drawn that the fingerprint, in fact, was from March 26th because the side entry, the side window, was the point of entry for the earlier entry. Correct. And the back window was apparently the point of entry for the later incident. Correct. Although nobody really knows how many times he attempted to enter the house and through what means. I believe it was a detective's testimony that the screen was completely pushed out of the window when he examined the room the next day after the incident with the two younger daughters. The screen in the back of the house above the bed was pushed completely out of the way, whereas the screen was only partially open in the side window. Further circumstantial evidence that the back window with the screen completely out of the way was the point of entry on that night. How do we know that Givens, who was the initial person identified by the nine-year-old, was not, in fact, the perpetrator? Detective McPike, I believe, testified that when he did a search of the car, Givens' car, which was parked at the hospital, he found a receipt for a CVS pharmacy that was time stamped at a time that would put him in a different part of the city when the crime was committed. So ultimately it was determined that he was basically pill shopping that night. He had been to a CVS pharmacy trying to get pills, and then he was at the hospital. Was he an employee of the hospital? No, no. What was he at the hospital for, do we know? Trying to get pills. The hospital was across the street from this house? Yes. And where did Goza live? McPike testified that Goza lived. He testified, and I apologize, I don't have the page ID. I couldn't find it this morning. He testified that the Jarvis' lived on a dead-end street that dead-ended into basically the hospital. It wasn't a dead-end street, but their street. Dead-easy walking distance. Right, dead-ended into a street across which was the hospital, and then across the hospital's parking lot sort of caddy corner was the street that Goza lived on, and that you could actually see Goza's house from Jarvis' porch. So it was easy walking distance. Yes, that's correct. I mean, would you concede that, in fact, it was ineffective assistance of defense counsel not, though, to bring up that CA had initially identified Givens as the perpetrator? I mean, there's no reason in the world why a defense counsel wouldn't have done that, is there? I mean, I think your main claim is it's not prejudicial because of overwhelming evidence, but as far as should defense counsel have, on cross-examination, said, hey, CA, Goza wasn't the man you initially identified. Is there any justification for not doing that? Well, I'm not a prosecutor and I'm not a criminal defense attorney, but I do hate to concede deficient performance. I will say that if the shoe were on the other foot and Givens were the defendant here, we know what the argument would be, is that a stand-up identification is incredibly coercive, incredibly prejudicial, and is inherently unreliable. So it's possible that he wanted to save himself from being a hypocrite by putting this evidence on the record. But, yeah, it seems a stretch. I mean, that's a stretch, but that's certainly true. My whole defense is, hey, Goza's whole defense is, it wasn't me. I wasn't there. Well, I mean, if she identifies another person as, oh, he was the perpetrator, I can't imagine any competent counsel not wanting that. That's the only thing they have to write about. Absolutely. I mean, there seems to be scant reason that it wouldn't be something that you would want to put before the jury. On the other hand, McPike said in his affidavit that her identification of Givens was tentative, was the word that was used more than once, whereas when he described her identification of Goza in the photo array, that it was practically immediately she walked over to the photo array, said that he looked just like him, and pointed at Michael Goza and walked away. So I think the relative strength of the identifications would have rendered the testimony about Givens to be not as consequential as Goza would like to. That goes to the prejudice. Yeah, absolutely. Because, right, you're upholding what happened. It really has to be that we have to agree with you that it doesn't shake our confidence, because if it does shake our confidence, the incompetence of counsel, you're going to get reversed. But if you think, well, okay, the defense counsel goofed up, but there's other evidence that convinces us that it's overwhelming enough to where it wouldn't have influenced the jury even if he had cross-examined what this case is about, right? Absolutely, and that's what two federal judges have already determined. The magistrate and the district judge both felt that while it might have been deficient performance, there's certainly no prejudice here because the evidence was so overwhelming. He had the motive. He had the opportunity. He was familiar with the landscape. He'd been in the house before for a sexual purpose. He left his fingerprint on the window that he gained entry to and found a little girl. The little girl unequivocally identified him, and that's pretty much the end of the story. His defense was that he was, or at least his fiancée said he was with her at the time this happened. Asleep in bed, yes. So I'm sorry, I left out that part. He had no real alibi other than to say that he was asleep at home. Did he testify at all? He did not testify, no. His only evidence was the fact that his fiancée said he was with her at the time this event. Your position would be that the fiancée was committing perjury. I believe the fiancée testified that we were both asleep, so she just assumes that he was there the whole time. I wouldn't accuse her of perjury, just not really any direct knowledge of what he did while she was asleep. The only additional piece of evidence that I think you didn't mention, CA did identify Mr. Goza again at trial. Is that correct? That's correct. Unless there are any other questions. Okay. Thank you. Ms. Cunliffe. I want to take issue with counsel's characterization of the fiancée's testimony as not a real alibi. I mean, frankly, what else was she going to say and what else would any of us do in order to demonstrate that we were somewhere else or in bed asleep in the middle of the night? And she testified that she was asleep, but because he was against the wall, because he has trouble maneuvering, she would have felt him get out of bed. That's not a real alibi, but it really calls into question even more why this evidence was so important. CA's testimony, CA's information. Well, if the defense counsel hadn't raised that, you would have said that was ineffective decisions of counsel, right? I'm sorry? If defense counsel hadn't raised the fact that his fiancée would have testified that he was with her, you would say that was ineffective assistance of counsel, wouldn't you? I most certainly would. I agree, Judge Seiler. What I'm trying to say is that's a real alibi. I mean, that's what he had, and that's real, and it's all he could do. The fact that he also then didn't go after CA's earlier identification is all the more prejudicial. You noted that she identified him in court, and she did. She was very confident. She said, that's the guy. All the more reason why the jury needed to know that she identified somebody else initially. All this talk about the comparative reliabilities of stand-up, show-up IDs versus six-man photo arrays is really speculation at this point, particularly given this record, particularly given the fact that I argued originally that counsel was ineffective for failing to bring in a memory expert to explore these issues so that the jury would also have this information as well. Granted, we're not at that point here, but the counsel would then try to weigh the relative reliabilities of these two different forms of identification. There is no question that eyewitness identifications have problems. We've noted that the state of Ohio, the General Assembly, has actually passed what's called, in Senate Bill 77, information elastidating that both these kinds of identifications, both the stand-up and the six-man simultaneous photo arrays, are prima facie evidence, if they're used in a case, of giving rise to a motion to suppress the identification. Everybody is concerned with this testimony. All the more reason why the jury needed to be aware of it, and counsel needed to argue it. This idea that this is an M.O. for him, I call into question the idea that because Goza was interested in a 16-year-old girl, that he would necessarily go in and molest a 3-year-old or a 9-year-old. That's simply not an M.O. There are an awful lot of trial courts where that information would have been kept out, except in this case it was charged. Again, I want to go on and underscore that he was not charged with sexual misconduct in relation to T.A., which means that somebody believed something here, that there wasn't necessarily a non-consensual attack going on. Ultimately, Your Honors, Michael Goza is serving a 31-year sentence. He received, after a trial, where he was represented by a lawyer who was dealing with his own discipline issues and was subsequently disbarred, and that is part of this record. When his jury found him guilty, there was important information. There was a lot of important information. We're here right now on one issue, but there were other issues. That's not relevant to this case. It is, but it's all the more reason why he should have a new trial. Why not get it right? Why not have somebody zealously represent, undistractedly represent their client's interests? This case was rushed to trial in three months. Somebody could take the time to zealously represent their client in a circumstance like this, where there's so much at stake. With that, we ask that you grant the writ, reverse this matter to the district court with an order that the case be remanded for a new trial. Thank you. We thank you both for your argument, and we'll consider the case carefully.